Jason S. Hartley (SBN 192514)
Jason M. Lindner (SBN 211451)
STUEVE SIEGEL HANSON, LLP
550 West C Street, Suite 1750
San Diego, CA 92101
Telephone: (619) 400-5822
Facsimile: (619) 400-5832
Email:  hartley@stuevesiegel.com
          lindner@stuevesiegel.com

Garrett D. Blanchfield (*pro hac vice* forthcoming)
Brant D. Penney (*pro hac vice* forthcoming)
REINHARDT WENDORF & BLANCHFIELD
E1250 First National Bank Bldg.
332 Minnesota Street
St. Paul, MN  55101
Telephone: (651) 287-2100
Facsimile:  (651) 287-2103
Email:   g.blanchfield@rwblawfirm.com
           b.penney@rwblawfirm.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Scott Frederick, Charles Poon, Andrea Hogan, Tina Heim, Monica Morrow, Mark Cardillo, and Allison Shipp, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Qualcomm Incorporated,<br><br>Defendant. | Case No.  **'17CV377  L    WVG**<br><br>**CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES FOR VIOLATIONS OF FEDERAL AND STATE ANTITRUST LAWS, STATE CONSUMER LAWS AND THE COMMON LAW OF UNJUST ENRICHMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs, by and through their undersigned attorneys and on behalf of themselves and all others similarly situated, bring this class action for claims under federal and state antitrust laws, state consumer laws, and the common law of unjust enrichment, to obtain injunctive and equitable relief and to recover damages for the substantial injuries they and class members have suffered as a result of Defendant Qualcomm Incorporated's unlawful maintenance of a monopoly in baseband processors.

# I.    NATURE OF THE ACTION

1.    Plaintiffs are purchasers of cellular telephones and other cellular devices, each of which contains a baseband processor (also called a modem chipset), which are semiconductor devices that enable cellular communications in cellphones and other products.

2.    Plaintiffs bring this action against Defendant Qualcomm Incorporated ("Qualcomm") for Qualcomm's unlawful maintenance of a monopoly in baseband processors. Qualcomm has maintained its monopoly by engaging in anticompetitive, exclusionary conduct, including, without limitation: (a) failure to license standard-essential patents to all applicants on fair, reasonable and non-discriminatory ("FRAND") terms; (b) withholding Qualcomm's baseband processors unless a customer accepts a license to standard-essential patents on terms imposed by Qualcomm, including excessive and unlawful royalties that the customer must pay when using competitors' processors ("no license-no chips"); (c) refusing to license its cellular standard-essential patents to competitors, in violation of Qualcomm's FRAND commitments; and (d) entering into exclusive dealing arrangements, including with Apple Inc., a large and highly important cellphone manufacturer.

3.    Qualcomm's anticompetitive conduct has caused Plaintiffs and Class Members to pay inflated prices for each cellular telephone and cellular device they purchased and has excluded competitors, harmed competition, taxed Qualcomm's

competitors' baseband processor sales and reduced competitors' ability to compete and incentive to innovate.

4.     Plaintiffs bring this action on behalf of themselves and others similarly situated for injunctive relief and to recover for the substantial injuries they have suffered as a result of Qualcomm's violations of Section 2 of the Sherman Act, state antitrust and consumer laws and the common law of unjust enrichment. Plaintiffs seek injunctive relief, monetary damages and all available remedies to which they are entitled for Qualcomm's unlawful conduct.

## II.     PARTIES

### A.     Plaintiffs

5.     Plaintiff Scott Frederick is currently a resident of Colorado.  During the Class Period Mr. Frederick purchased several Apple iPhones for personal use and not for resale.

6.     Plaintiff Charles Poon is a resident of Canton, Michigan.  During the Class Period, Mr. Poon purchased a Samsung tablet and an Apple iPhone 7 for personal use and not for resale.

7.     Plaintiff Andrea Hogan is a resident of Cottage Grove, Minnesota. During the Class Period, Ms. Hogan purchased an Apple iPhone for personal use and not for resale.

8.     Plaintiff Tina Heim is a resident of Albuquerque, New Mexico. During the Class Period, Ms. Heim purchased an Apple iPhone 6 Plus for personal use and not for resale.

9.     Plaintiff Monica Morrow is a resident of Washingtonville, New York. During the Class Period, Ms. Morrow purchased an iPhone 5S, an Apple iPad, and an iPhone 7 for personal use and not for resale.

10.     Plaintiff Mark Cardillo is a resident of Trinity, North Carolina. During the Class Period, Mr. Cardillo purchased an Apple iPhone 6S for personal use and not for resale.

11.    Plaintiff Allison Shipp is a resident of Madison County, Tennessee. During the Class Period, Ms. Shipp purchased an Apple iPhone 5s, an Apple iPhone 6, an Apple iPhone 5s, an Apple iPad mini 2 and an Apple iPhone 6 Plus for personal use and not for resale.

12.    Each Plaintiff purchased during the Class Period a cellular telephone or other device containing a Qualcomm baseband processor and paid an inflated price directly resulting from Qualcomm's unlawful conduct set forth in this Complaint.

**B.    Defendant**

13.    Defendant Qualcomm is a Delaware corporation having its principal place of business at 5775 Morehouse Drive, San Diego, California 92121. Qualcomm is a global semiconductor company that designs and markets wireless networks in use around the world.

14.    Qualcomm has offices and employees in this District and regularly conducts business in this District.

15.    Qualcomm develops, designs, licenses and markets worldwide its digital communications products and services through its main business segments: Qualcomm CDMA Technologies ("QCT"), a wholly-owned subsidiary of Qualcomm which engages in equipment sales; and Qualcomm Technology Licensing ("QTL"), a wholly-owned subsidiary of Qualcomm which grants licenses and provides rights to use portions of Qualcomm's patent portfolio. QCT is operated by Qualcomm Technologies, Inc. ("QTI"), another wholly-owned subsidiary of Qualcomm.

**III.    JURISDICTION**

16.    This action arises under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 16, for Defendant's violations of Section 2 of the Sherman Act, 15 U.S.C. §§ 2, and Section 3 of the Clayton Act, 15 U.S.C. § 3.  The Court

has subject matter jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331 and 1337.

17.    The Court has supplemental jurisdiction over the pendant state law claims asserted herein under 28 U.S.C. §§ 1332(d) and 1367. Each of Plaintiffs' state law claims arises out of the same factual nucleus as Plaintiffs' federal law claims.

18.    This Court has personal jurisdiction over Qualcomm because it has its principal place of business in this District and because Qualcomm's unlawful actions caused harm in this District.

19.    The facts in this Complaint support jurisdiction in this case.

## IV.    VENUE

20.    Venue is proper within this District under 28 U.S.C. §§ 1391(b) and 1391(c) and Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 28. A substantial part of the events giving rise to Plaintiffs' claims occurred in this District. Qualcomm transacts business and maintains facilities in this District and thus is subject to personal jurisdiction here. Qualcomm is engaged in interstate commerce, and its activities, including those activities that form the basis of this Complaint, substantially impact interstate commerce.

21.    Millions of cellular devices were purchased at artificially inflated prices in this District in recent years.

22.    The facts in this Complaint support venue in this case.

## V.    FACTUAL ALLEGATIONS

### A.    Broadband Processors and Standards

23.    Each cellular device purchased by Plaintiffs and Class Members contains a modem chipset, sometimes also referred to as a baseband processor. This chipset allows the device to communicate and transmit voice and data across wireless networks controlled by carriers, such as AT&T, Verizon or Sprint.

24.     For a cellular network to operate, and for each component to work with the other components, regardless of which company makes each part, carriers, mobile wireless device manufacturers and baseband processor chipset manufacturers must agree to follow a common set of standards. The standards control how each part of a network communicates with the other parts. For decades, cellular service providers, baseband processor chipset manufacturers and wireless device manufacturers have formed and joined standard-setting organizations ("SSOs"). The SSOs create and distribute common standards for all members to follow.

25.     To communicate with an operator's network, a cellular device must contain a modem chipset that meets certain cellular communications standards supported by that network.  SSOs collaborate to set technology requirements that ensure mass interoperability among all system components.  Because a standard requires that devices utilize a specific technology, standard-compliant devices will sometimes infringe on patents for technology that is incorporated into the standard.  Such patents are called standard essential patents ("SEPs").  SEP holders receive licensing fees and royalties from the use of their technology.

26.     Before selecting a standard, SSOs require that the developers of these standards agree to license their technology on fair, reasonable, and nondiscriminatory ("FRAND") terms.  This ensures that competitors will not be excluded from the market, and device manufacturers will not be subjected to unreasonable terms.

27.     Standards are critical in creating a common technology platform because they allow the delivery of different network components by multiple suppliers, promote interoperability of products and provide incentives to invest in infrastructure.

28.     A system of uniform standards requires certain trade-offs by companies and consumers. As an example, a company implementing standards in

a product must use certain required technology, even where viable alternatives, which may even be superior, exist. Following adoption of a standard, participants will then invest into this standard, including making compliant parts, building cellular towers, and designing handsets with particular capabilities. Because participants face substantial costs if it became necessary to switch to a different standard, an entire industry will become "locked in" to a standard. Also, once a standard is adopted and implemented, a company cannot substitute alternative technologies in its products because those products will no longer work with any established network. As a result, standard-setting is accompanied by safeguards to prevent the abuse of monopoly power.

29.    Where standardized technologies are covered by patents, called standard-essential patents ("SEPs"), companies that implement a standard are often required to practice those patents. Without safeguards to guard against abusive practices, patent holders could demand inflated or discriminatory royalties from product companies, who have no other choice than to use the technology, and could demand and obtain royalty payments based not on the market value of the patents, but on the costs and the impossibility of switching away from standardized technology. This abusive conduct is referred to as "patent-holdup" and occurs "when the holder of a standard-essential patent … demands excessive royalties after companies are locked in to using a standard." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1209 (Fed. Cir. 2014); *see also* U.S. Dep't of Justice & U.S. Dep't of Commerce, Patent & Trademark Office, <u>Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments</u> (Jan. 8, 2013).[1] Higher royalties are passed on in the form of higher prices, injuring consumers, including Plaintiffs and Class Members.

---

[1] https://www.justice.gov/sites/default/files/atr/legacy/2014/09/18/290994.pdf (last visited January 25, 2017)

6

B.    **FRAND Requirements**

30.    As noted above, device and component manufacturers and others have to agree on uniform standards to ensure the operation of the cellular network and the cellular devices that connect to it. As a result, cellular network carriers, chipset manufacturers, cellular device manufacturers and others are members of SSOs, such as the European Telecommunications Standard Institute ("ETSI"), the International Telecommunications Union ("ITU"), and the Institute of Electrical and Electrical Engineers ("IEEE").

31.    SSOs create standards and technical specifications. They also declare patents that are essential to those standards.

32.    To address the economic effects of standardization that would artificially inflate royalties for SEP's, SSOs require participants who claim to own SEPs to disclose those patents publicly and to promise to offer licenses for those patents to all companies implementing the standard either royalty-free or on FRAND terms. If a patent holder does not make this promise, SSOs generally design the standard without using the patented technology. Holders of patents essential to technology incorporated into a standard declare their patents as SEPs. Manufacturers of products containing the patented technology generally need to license the SEP to be compliant with the applicable standard.

33.    Before agreeing to a particular standard, SSOs seek certain assurances and commitments from patent owners. In particular, SSOs will ask SEP holders to agree to license their patents on fair, reasonable and non-discriminatory terms, also referred to as "FRAND" obligations.

34.    A SEP holder that makes a FRAND commitment promises to license its SEPs to anyone willing to accept a license (a "willing licensee") and thereby gives up its right to exclude any willing licensee from the standards-based technologies. This commitment serves as an important check on the patent holder's power to use SEPs to "hold up" implementers of the standard by refusing

1

1    to license competitors or the customers of competitors, or by licensing competitors

2    or their customers only on discriminatory terms that undermine competition

3    among implementers of the standard. Without the FRAND commitment, SEP

4    holders would be ensured monopoly profits because the standard requires use of

5    the patented technology.

6        35.    FRAND obligations are critical tools in preventing monopoly hold-up

7    and ensuring that common standards remain accessible to all companies wishing

8    to implement them. *See Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR,

9    2013 WL 2111217, at *11 (W.D. Wash. Apr. 25, 2013) (noting that SSOs seek to

10   prevent hold-up through the use of the FRAND commitment).

11       36.    Additionally, FRAND royalties must be limited by the actual

12   technical contribution of the patented technology to the standard, rather than (a)

13   the "lock-in" value arising from standardization of technologies (the value gained

14   simply because companies are forced to use the technology mandated in the

15   standard), (b) the value of all the technologies incorporated in an entire standard,

16   or (c) the competing value of the many technologies, and many other standards

17   that constitute the actual device.

18       37.    FRAND obligations are intended, among other things, to prevent SEP

19   holders from monopolizing control over required technology and eliminating

20   competition.  SEP holders agree to these FRAND terms because otherwise the

21   SSOs may exclude their technologies from the standard.  SEP holders also benefit

22   from the license fees and royalties gained from their cooperation with the SSOs.

23       38.    When a SEP holder agrees to a FRAND requirement with an SSO,

24   implementers of the standard and their customers are the third-party beneficiaries

25   of that requirement. However, FRAND obligations are not just a private contract

26   between owners of technology and SSOs.  Rather, they are a core foundation that

27   allows antitrust tolerance of the industry collaboration on which standard-setting

28   depends.

2

39.    As the Third Circuit Court of Appeals has explained the importance of FRAND commitments as important safeguards on monopoly power:

> [A] standard, by definition, eliminates alternative technologies. When a patented technology is incorporated in a standard, adoption of the standard eliminates alternatives to the patented technology. Although a patent confers a lawful monopoly over the claimed invention, its value is limited when alternative technologies exist. That value becomes significantly enhanced, however, after the patent is incorporated in a standard. Firms may become locked in to a standard requiring the use of a competitor's patented technology. The patent holder's [intellectual property rights], if unconstrained, may permit it to demand supracompetitive royalties. It is in such circumstances that measures such as FRAND commitments become important safeguards against monopoly power.

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007) (citations omitted).

### C.    The Cellular Industry, the Evolution of Cellular Standards and Qualcomm's Market Dominance and Abuse of Power

40.    Distinct generations have occurred in wireless standards as technology advanced. The first-generation technology used analog technology which allowed only voice transmission and slow data transmission. This first-generation technology had significant capacity limitations, poor data transfer and lower security.

41.    Second generation ("2G") cellular technology implemented two main technology paths or families of standards: (1) the "Global System for Mobile Communications" ("GSM") standard; and (2) the "Code Division Multiple Access" ("CDMA") standard. 2G technology provided improved voice and data capacity, supported additional functions such as text and multi-media messages, and offered increased privacy and security at lower prices. Most cellular telephones today use (at a minimum) 2G technology and standards, with GSM

being the most widely used 2G technology. CDMA is a channel access method used by various radio communication technologies. CDMA provides multiple access, where several transmitters can send information simultaneously over a single communication channel. GSM is widely used in Europe and much of Asia, other than Japan and South Korea. GSM uses a variation of time division multiple access. Cellular telephone providers have operated under one or the other path. For example, Verizon and Sprint operate CDMA-path networks and AT&T and T-Mobile operate GSM-path networks. The CDMA and GSM technology paths are not interoperable; equipment and technologies designed to be compatible with one standard cannot be used for the other standard.

42.    Third generation ("3G") cellular technology included the "Universal Mobile Telecommunications Service" ("UMTS") standard, which used "Wideband Code Division Multiple Access" ("WCDMA") technology, allowing for further increased data speed and capacity. 2G and 3G technologies continue to be simultaneously deployed in products, and devices with only 3G/UMTS/WCDMA technology are rare. Instead, 3G/UMTS/WCDMA products work in combination with 2G technology.

43.    LTE, sometimes referred to as a 4G cellular standard, is an upgrade to 3G/UTMS/WCDMA. This fourth-generation cellular standard provides enhanced radio interface and all-IP network technology. The LTE standard has continued to progress, with specified higher download speeds and advanced power-saving features, among other functions.

44.    3G and 4G technology are often used in tandem through "multimode" chipsets that are compatible with both sets of standards.

45.    Baseband processor chip sets implement one or more of these standards.

46.    Each of these major cellular standards has carrier networks that employ them. Mobile devices are configured for a particular carrier (such as

AT&T or Verizon), and therefore chipsets used in a particular wireless device must conform to the standard technology chosen for the carrier's associated network. Consequently, chipsets that comply with one standard may not be substituted for chipsets that comply with other standards. Additionally, these chipsets have different price and demand characteristics. Consumers purchase cellphones that include these chipsets, which are configured to operate using the standards of a particular network. Once the cellphones or other devices are purchased, consumers are then tied to that standard for use of that device.

47.     One family of standards, used by U.S. carriers such as AT&T and T-Mobile, employs the GSM standard for 2G communications and the complimentary UMTS standard for 3G communications. A rival family of standards, used by U.S. carriers including Verizon and Sprint, employs the CDM standard and related technologies (e.g., CDMA 2000). Both families have adopted the LTE standard, while requiring backwards compatibility to their respective 2G and 3G technologies.

48.     For many years Qualcomm has had and continues to possess monopoly power in the sale of baseband processor chipsets that implemented several of these various cellular standards and generations.

49.     Qualcomm controlled, and continues to control, the market for CDMA technology, initially selling 90% of the chipsets that go into CDMA-compatible phones and continuing to control over 80% of the market. Additionally, Qualcomm has control over many patents related to this standard. As a result, almost any company that makes CDMA products has to obtain a license from Qualcomm. Licensees pay a one-time fee for access to the patent portfolio and then royalties based on the final product sold.  Almost all wireless companies have signed patent licenses with Qualcomm.

50.     In short, Qualcomm has monopoly power in the supply of chipsets that support CDMA, on which devices sold by Verizon and Sprint continue to

depend. Original equipment manufacturers ("OEMs") wishing to sell devices on CDMA networks must use CDMA chipsets, meaning that these OEMs depend on access to Qualcomm's chipsets. Qualcomm prices its CDMA chipsets without regard to competitive alternatives. Qualcomm has maintained for many years a market share of over 80% of the CDMA chipset market, despite attempts by competitors, including Intel, VIA Telecom, Texas Instruments and Eonex, to enter and gain a foothold in the market. Qualcomm has used its monopoly power in CDMA chipsets to obtain anticompetitive license and chipset supply terms from customers.

51.     Additionally, Qualcomm has monopoly power in the market for premium LTE-enabled chipsets, particularly when coupled with CDMA functionality. Premium LTE chipsets, typically used in flagship smartphones, are sold by Qualcomm at different and higher prices. There are no reasonable substitutes for these chipsets for device manufacturers seeking to sell flagship smartphones with advance features for use on networks requiring LTE chipsets. In its 2016 Annual Report, for example, Qualcomm recognized market segments for "premium-tier integrated circuit products" and "premium-tier smartphones." For many years Qualcomm has maintained a dominant share – 80% or more – of premium LTE chipsets sold in the relevant market. Qualcomm has used its monopoly power in premium LTE chipsets to obtain anticompetitive license and chipset supply terms from customers.

52.     The UMTS standard was adopted by the ITU, ETSI, IEEE, and other SSOs in the United States and elsewhere following an evaluation of alternative available equipment and technologies. Qualcomm supplies some of the essential technology that the ETSI included in the UMTS standard. Qualcomm has intellectual property rights ("IPRs"), such as patents, in this technology. Among others, Qualcomm owns the essential patents for the WCDMA standard.

53.     CDMA-based technology has been adopted for all 3G wireless telephony and broadband standards throughout the world. As a result, Qualcomm has received more than $50 billion in licensing revenues since 2000. Qualcomm charges a royalty on nearly every smartphone made, whether or not the device uses Qualcomm's chips.

54.     Qualcomm's dominance in all relevant product markets is protected by substantial barriers to entry which include, but are not limited to: (a) the time and cost of product development and network certification, including necessary economies of scale, scope and learning; (b) the intellectual property rights of Qualcomm and others; (c) establishment of product reputation and compatibility; (d) Qualcomm's exclusionary conduct set forth in this Complaint; and (e) obtaining the certification of network operators for the use of baseband processor chipsets sold for use on carriers' networks, involving significant expenditures of time and money.

55.     The development of a chipset takes years of complex engineering and the investment of hundreds, and perhaps billions of dollars. These barriers to entry increase with the processing power and functionality of a particular chipset, and become especially significant in the premium LTE chipset market.

56.     Another barrier to entry is found in the fact that Qualcomm has declared thousands of patents as essential to the CDMA, UMTS and LTE standards. Navigating this array of patents increases the costs and risks associated with new entry into the chipset market and constitute further barriers to entry.

57.     Qualcomm's unfair and exclusionary conduct maintained and strengthened its monopoly position in the relevant product markets by depriving rival chipset manufacturers of necessary economies of scale, scope, and essential experience.

58.     In 2006, there were multiple vendors of baseband chipsets, including Broadcom, Ericsson, Renesas, and Texas Instruments. Today, Intel is Qualcomm's

1   only competitor in the market for premium LTE chipsets. Qualcomm has no

2   competition in the market for premium LTE chipsets with CDMA functionality.

3        59.    SSOs, including ETSI, require a commitment from vendors whose

4   technologies are included in the CDMA and other CDMA-based standards to

5   license their technologies on FRAND terms.

6        60.    For example, Qualcomm is a member of ETSI, an SSO based in Sofia

7   Antipolis, France, which includes over 800 members from countries in five

8   continents. ETSI produces globally accepted standards for the telecommunications

9   industry. ETSI, for example, created, or helped to create numerous

10  telecommunication standards, including the 2G/GSM, 3G/UMTS, and 4G/LTE

11  cellular communications standards.

12       61.    Like other SSOs, ETSI requires participants to commit to abide by its

13  Intellectual Property Rights ("IPR") Policy, which details the rights and

14  obligations of its members.

15       62.    The IPR Policy requires that SEP owners such as Qualcomm submit a

16  written commitment that they will grant irrevocable licenses on FRAND terms. If

17  no FRAND commitment is made, the IPR Policy provides for ETSI to explore

18  alternative technologies for the standards.

19       63.    Qualcomm has submitted IPR undertakings to ETSI, including stating

20  that Qualcomm is "prepared to grant irrevocable licenses under this/these IPR's on

21  terms and conditions which are in accordance with Claus 6.1 of the ETSI IPR

22  policy." [ETSI Rules of Procedure, Appx. A,

23  http://www.etsi.org/website/documents/legal/etsi_ipr-policy.pdf.]

24       64.    Qualcomm is therefore contractually obligated to grant licenses on

25  FRAND terms to its patents to manufacturers of products that conform to ETSI

26  standards with the baseband processor chipsets they use, as well as to third-party

27  suppliers of baseband processor chipsets. Qualcomm also made similar promises

28  to other SSOs.

65.     Qualcomm's promises to comply with its FRAND obligations induced the SSOs to adopt Qualcomm's technology in the cellular technology standards relevant to this action. That conduct constituted deceit and fraud on the SSOs, and has injured Plaintiffs and others that have paid unreasonably high prices for cellular devices as a result of Qualcomm's royalty demands.

66.     Qualcomm has abused its power over SEPs and the chipset supply to increase and maintain its dominance in these markets and charge excessive royalties.  As discussed below, Qualcomm's manipulation of its dominant market position and its anticompetitive practices are confirmed by multiple investigations of its conduct by international competition agencies.

67.     The fourth generation of cellular technology ("4G") brought the "LTE" standard ("long term evolution of UMTS"). Almost all cellular-enabled devices that are sold today support LTE.   LTE is an "orthogonal frequency division multiple access" or "OFDMA" technology, used instead of the prior CDMA-based technologies.

68.     Qualcomm holds an extensive patent portfolio that applies to LTE technologies, including OFDMA, under which is has sold licenses to a multitude of major telecommunications companies, including giants such as LG and Samsung. Additionally, many of the 4G-based cellular devices still implement CDMA technology to be backwards-compatible. Qualcomm exclusively supplies the multimode CDMA-LTE chipsets that are backward compatible with CDMA while also utilizing the newer LTE technology.

69.     Qualcomm has been able to use its leverage over CDMA to gain a greater share of the LTE-chipset market. The following chart, prepared as part of the KFTC's findings, demonstrates its growing dominant market share[2]:

---

[2] *See* KFTC Issued Press Release Dated December 28, 2016 – Unofficial English Translation, https://www.qualcomm.com/documents/kftc-issued-press-release-dated-december-28-2016-unofficial-english-translation (last visited Jan. 24, 2017).

As this chart shows, Qualcomm has had a dominant market share of both LTD and

**<Qualcomm's Market Share Trend in Modem Chipset Market per Standard (Based on Revenues)>**

|  | Yr 2008 | Yr 2009 | Yr 2010 | Yr 2011 | Yr 2012 | Yr 2013 | Yr 2014 | Yr 2015 |
|---|---|---|---|---|---|---|---|---|
| LTE | - | - | 34.2% | 58.8% | 94.5% | 96.0% | 84.8% | 69.4% |
| CDMA | 98.4% | 97.6% | 96.4% | 94.3% | 92.4% | 93.1% | 91.6% | 83.1% |
| WCDMA | 38.8% | 47.4% | 45.7% | 55.0% | 50.4% | 53.9% | 48.8% | 32.3% |

* Source: Strategy Analytics

CDMA chipsets.  Qualcomm has been able to use its monopoly power over the supply of these chipsets to force device manufacturers into anticompetitive license agreements.  As one commentator noted: "Qualcomm's status as both a chipset and IP vendor provides them with unparalleled leverage to collect licensing fees at a lower cost, simply by denying physical delivery of the chipsets until all fees are paid."[3]

70.    Qualcomm also holds a dominant position in the SEP licensing market for its intellectual property relating to modem chipsets. Qualcomm has declared thousands of patents as essential to CDMA, UMTS (WCDMA), and LTE standards.  Qualcomm thus controls the licensing market for SEPs for these technologies, as manufacturers could not produce 3G and 4G devices without infringing on these patents.  Qualcomm uses its SEPs to require OEMs and others to license its entire patent portfolio, which includes bundling in non-SEPs as well. Further, there is no requirement that non-SEPs be licensed on FRAND terms.  By putting both SEPs and non-SEPs into one license, Qualcomm attempts to avoid its FRAND requirements, and instead charge exorbitant royalties to licensees that have no choice other than to accept the packaged patent licenses.

71.    Qualcomm's licensing division brings in the vast majority of its profits – nearly double the profits from actual sales of chips – as illustrated in the

---

[3] Richard A. Taddonio, *Long – Qualcomm (NASDAQ: QCOM) - $68.42*, Columbia Business School 2015, https://www8.gsb.columbia.edu/valueinvesting/sites/valueinvesting/files/Taddonio_Richard-QCOM_0.pdf (last visited Jan. 25, 2017).

graph below.  As such, it is critical for Qualcomm to maintain its anticompetitive and inflated licensing terms.



72.    Qualcomm has structured its business to maintain that licensing power.  In 2007, Qualcomm claimed publicly that any manufacturer using CDMA and UMTS/WCDMA technology "ha[s] to take out a license from Qualcomm" and that Qualcomm had been "pretty consistent in that model."[4]

73.    One of the most-thorough examinations of Qualcomm's practices to date comes from the investigation conducted by the Korean Fair Trade Commission ("KFTC"), which ultimately resulted in a $854 million fine.[5]  The KFTC identified three abusive and anticompetitive practices of Qualcomm: (a) Qualcomm did not provide SEP licenses to competing chipset companies while threatening to sue them under those patents if they compete against Qualcomm in the sale of chipsets; (b) in selling baseband processors to OEMs like cellular phone makers, Qualcomm demanded the execution and performance of its license agreements, thus leveraging its SEPs improperly; and (c) as a result, QTL coerced cellular phone makers to accept unilateral onerous terms.

---

[4] Qualcomm, Inc. at Jefferies Technology Conference (Oct. 2, 2007), at 5.

[5] See Section V.D., *infra.*

74.    The KFTC illustrated Qualcomm's conduct as follows[6]:



75.    Qualcomm's has protected and maintained its market power by not licensing SEPs to competing chipset makers while, at the same time, insisting on licensing from cellular device manufacturers.

76.    Additionally,  Qualcomm's conduct creates an incentive for OEMs and other mobile device suppliers to agree to exclusive or near-exclusive deals with Qualcomm on the purchase of chipsets, since OEMs cannot purchase chipsets from Qualcomm's competitors without also paying royalties to Qualcomm.  As the FTC noted in its recent complaint against Qualcomm, since 2007, Apple has entered into agreements to deal exclusively with Qualcomm in exchange for partial relief from Qualcomm's standard royalties.  FTC's Redacted Compl. ¶¶116 - 130, *FTC v. Qualcomm Incorporated*, No. 5:17-cv-00220 (N.D. Cal., filed Jan. 17, 2017).  Samsung has also entered into a similar exclusive dealing arrangement with Qualcomm.[7] Notably, Apple, one of Qualcomm's largest customers, (if not

---

[6] *See supra* note 2.

[7] Joel Hruska, *Qualcomm may have inked exclusive deal to put Snapdragon 820 in Samsung hardware*, ExtremeTech.com (Dec. 21, 2015)

the largest) has also recently filed suit against Qualcomm as a result of these practices.

77.    These exclusive supply arrangements, born from Qualcomm's prohibitive royalty terms, effectively deny other baseband processor suppliers the opportunity to compete effectively in the market.

78.    As the KFTC explained, Qualcomm's licensing practices have prevented any significant competitor from entering the market and instead have caused many existing competitors to exit it, despite the market doubling in size since 2008[8]:



<Market Growth Trend in the Modem Chipset Market and Market Exit by Major Chipset Companies>

| Modem Chipset Maker | Exit (Imminent) Time |
|---|---|
| NXP | August 2008 |
| TI | October 2008 |
| Freescale | October 2008 |
| ST Micro | February 2012 |
| NEC | February 2014 |
| Broadcom | June 2014 |
| Ericsson | September 2014 |
| Nvidia | May 2015 |
| Marvell | September 2015 |

79.    The result has been a continued increase in Qualcomm's share of the chipset market[9]:

---

https://www.extremetech.com/mobile/219791-qualcomm-may-have-inked-exclusive-deal-to-put-snapdragon-820-in-samsung-hardware.

[8] *See supra* note 6.

[9] *Id.*



80.    Qualcomm's royalty rates are significantly higher than others in the industry, in part because of how Qualcomm calculates these rates.  Qualcomm's royalties are generally based upon a percentage of the wholesale selling price of complete licensed products, net of certain permissible deductions.  Using the entire value of an end product is not a reasonable basis for calculating these royalties.  In fact, the IEEE and its Standards Association's licensing policy states that a reasonable royalty should be the value attributable <u>to a SEP</u>, excluding the value of that SEP's inclusion in an IEEE standard, and that a factor to consider when determining the reasonable rate is the value of the relevant functionality of the <u>smallest salable compliant implementation</u> that practices the essential patent claim.  But, Qualcomm's power and leverage forces its licensees to pay these excessive rates based on the price of the find end product, which results in a royalty that bears no relation to the actual value attributable to its technologies and intellectual property.

81.    As a further example of the problematic nature of these royalties, Qualcomm's royalty based on the final selling price means that Qualcomm charges manufacturers of higher-value smartphones substantially more for a license than Qualcomm charges manufacturers of basic cellphones, despite the fact that the wireless communications functionality in the two products is similar or

14

identical. Qualcomm's practice is inconsistent with its FRAND promise. *See In re Innovatio IP Ventures, LLC Patent Litig.*, No. 11 C 9308, 2013 WL 5593609, at *38 (N.D. Ill. Oct. 3, 2013) (noting that a RAND licensor "cannot discriminate between licensees on the basis of their position in the market"). As Apple Inc. alleges in its recently filed lawsuit challenging Qualcomm's anticompetitive practices, Apple sells high-end products with a selling price between $399 for a 16GB iPhone SE and $969 for a 256GB iPhone 7 Plus, while Walmart sells an unlocked 16GB Kyocera 4G LTE smartphone for less than $100. *Apple Inc. v. Qualcomm Inc.*, No. 17CV0108 GPC NLS, Redacted Complaint ¶ 145 (S.D. Cal. Filed Jan. 20, 2017). Qualcomm charges a far-higher royalty payment for the use of its SEPs in the more expensive Apple phones, despite the fact that the contribution of wireless capability to both phones is similar. Apple further alleges that its royalty payment to Qualcomm for Apple's 16BG iPhone 6 SE would be about four to nine times more than Kyocera's royalty for its smartphone. *Id.* This significant difference in treatment is inconsistent with the fundamental non-discriminatory premise of FRAND obligations.

82.    Qualcomm's excessive royalties based on the selling price of the device ignores precedent that forbids basing a royalty on the entire device unless the patent involved drives consumer demand for the whole device. Instead, the law requires that patent holders must base royalties, at most, on the smallest saleable patent-practicing unit. *See*, *e.g.*, *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (noting that "it is generally required that royalties be based not on the entire product, but instead on the 'smallest saleable patent-practicing unit'"); *Golden Bridge Tech. v. Apple Inc.*, No. 5:12-cv-04882-PSG, 2014 WL 219501, at *6 (N.D. Cal. May 18, 2014) ("[I]n any case involving multi-component products, patentees may not calculate damages based on sales of the entire product, as opposed to the smallest saleable patent-practicing unit ['SSPPU'], without showing that the demand for the entire product is attributable

to the patented feature."); *Innovatio IP Ventures*, 2013 WL 5593609, at *13 (applying the smallest saleable unit requirement to FRAND royalties).

83.    The smallest saleable unit for a cellular SEP license should be no greater than the baseband processor chipset, where the inventive aspects of the patented cellular-standard technology is implemented or substantially practiced. *See GPNE Corp. v. Apple, Inc.*, No. 12-CV-02885-LHK, 2014 WL 1494247, at *13 (N.D. Cal. Apr. 16, 2014) (holding "as a matter of law that in this case, the baseband processor is the proper smallest saleable patent-practicing unit").

84.    Qualcomm's royalty rates for its SEPs exceed a reasonable royalty under FRAND.

85.    As noted above, Qualcomm has excluded competitors and harmed competition by, among other things, withholding its baseband processors unless a customer accepts a license to SEPs on terms dictated by Qualcomm, including exorbitant royalties that the customer must pay when using competitors' processors.  This policy is sometimes referred to as "no license – no chips."

86.    Qualcomm's "no license – no chips" policy significantly increases its customers' costs of challenging Qualcomm's preferred license terms. This puts Qualcomm's customers in a substantially different, weaker position than they would be in a typical patent license negotiation. The result is that Qualcomm's customers have accepted elevated royalties and other license terms that they might otherwise challenge.

87.    Qualcomm's refusal to license its competitors bolsters its abilities to maintain unreasonably high royalties and other unreasonable license terms. Qualcomm's competitors, unlike its customers, do not depend on Qualcomm for baseband processor supply. As a result, they would be better positioned than customers to negotiate licenses on FRAND terms. But, by using its monopoly power to obtain unreasonably high royalties that apply to baseband processors supplied by its competitors, Qualcomm in effect collects a

16

1   "tax" on cellphone manufacturers and other purchasers if use non-Qualcomm

2   processors. This tax weakens Qualcomm's competitors by reducing demand for

3   their processors and maintains Qualcomm's monopoly power.

4         **D.**    **Competition Agencies Investigate and Take Action Against**

5                **Qualcomm**

6       88.    The past several years have brought government investigations of

7   Qualcomm by competition authorities in China, South Korea, Taiwan, Japan,

8   Europe and the United States.

9       89.    Competition law enforcement agencies in China, Japan, South Korea

10  and the European Commission have found Qualcomm to be in violation of the

11  competition laws of their respective jurisdictions.

12      90.    The FTC recently filed a lawsuit against Qualcomm, alleging it

13  monopolized the market for baseband processor chipsets. The FTC notified

14  Qualcomm of the investigation in September 2014. On January 17, 2017, the FTC

15  sued Qualcomm, alleging that it has monopolized the market for CDMA and

16  premium LTE baseband processor chipsets. The FTC's complaint includes alleged

17  anticompetitive conduct by Qualcomm set forth in this Complaint, including

18  Qualcomm's refusal to license competitors, Qualcomm's refusal to sell chipsets

19  without a license, and its imposition of exclusivity on Apple in exchange for a

20  degree of royalty relief. These anticompetitive practices, according to the FTC,

21  had the effect of marginalizing Qualcomm's competitors and raising prices above

22  competitive levels. *See* FTC's Compl., FTC v. Qualcomm Incorporated, No. 5:17-

23  cv-00220 (N.D. Cal., filed Jan. 17, 2017). *See also* Press Releases, <u>FTC charges

24  Qualcomm with Monopolizing Key Semiconductor Device Used in Cellphones</u>,

25  FTC (January 17, 2017), https://www.ftc.gov/news-events/press-

26  releases/2017/01/ftc/charges-qualcomm-monopolizing-key-semiconductor-device-

27  used.

28

1    91.    In November 2013, China's National Development and Reform

2  Commission ("NDRC") launched an investigation into Qualcomm's

3  anticompetitive practices.[10]

4    92.    On February 10, 2015, the NDRC found that Qualcomm violated the

5  abuse of dominance provisions of the China Anti-Monopoly Law. The NDRC

6  imposed a fine of roughly eight percent of Qualcomm's annual revenue within

7  China for 2013 —  totaling $975 million. The NDRC found Qualcomm was

8  dominant in a number of SEP licensing and baseband processor chipset markets,

9  including CDMA and LTE chipsets, and that this dominant position was protected

10  by barriers to entry. The NDRC further found that Qualcomm acted

11  anticompetitively by, *inter alia*, forcing device manufacturers to take a license to

12  Qualcomm's SEPs on unreasonable terms and as a condition of purchasing

13  Qualcomm's chipsets.

14    93.    The Japan Fair Trade Commission ("JFTC") has been investigating

15  Qualcomm since 2006. In September 2009, the JFTC found that Qualcomm

16  violated the Japanese Antimonopoly Act by forcing licensees to cross-license their

17  patents on a royalty-free basis and agree to a non-assert provision and ordered

18  Qualcomm to stop these practices.  Qualcomm has appealed the JFTC ruling and

19  no final decision has yet been issued.

20    94.    In July 2009, the KFTC imposed the largest fine ever on a company -

21  $207 million – on Qualcomm for abusing its dominant share of the CDMA chipset

22  market. Qualcomm continued to engage in unlawful conduct. After initiating a

23  new investigation into Qualcomm's monopolization of additional chipset markets,

24  and after holding numerous hearings, the KFTC issued a decision in December

25  2016 imposing a larger fine - $1.03 trillion South Korean Won (more than $850

26

27  [10] H. Stephen Harris, Jr., *An Overview of the NDRC Decision in the Qualcomm

28  Investigation July 2015*, CPI Antitrust Chronicle (July 2015), available at
http://www.winston.com/en/thought-leadership/an-overview-of-the-ndrc-decision-in-the-qualcomm-investigation.html.

18

million) – for Qualcomm's monopolistic conduct, and mandating changes to Qualcomm's business model. The KFTC found, among other things, that Qualcomm held a dominant position in the markets for CDMA chipsets and LTE chipsets, and that Qualcomm engaged in anticompetitive conduct by, among other things, refusing to license its cellular SEPs to competitors in violation of its FRAND commitments, and by forcing device manufacturers to enter into unfair license agreements by using its chipsets' supply as leverage. In other words, "Qualcomm actually used the threat of terminating the supply of modem chipsets as *negotiation leverage* in the process of licensing negotiations with handset companies." (Emphasis in original). The KFTC further found Qualcomm's control over the chipset market "is a structure under which handset companies have to bite the bullet and accept Qualcomm's license terms, even if they are unfair, because if the modem chipset supply is suspended, handset companies would face the **risk** of their **entire business** shutting down." (Emphasis in original).[11]

95.     In December 2015, the Taiwan Fair Trade Commission ("TFTC") notified Qualcomm of its investigation into the company's licensing conduct, including whether Qualcomm's royalty charges are unreasonable.

96.     In October 2014, the European Commission ("EC") notified Qualcomm of its investigation. The EC issued two Statements of Objections against Qualcomm in December 2015, one of which alleges Qualcomm's exclusivity arrangements with "a major smartphone and tablet manufacturer" harm chipset competition.[12] Upon information and belief the manufacturer referred to by the EC is Apple Inc.

---

[11] Press Release, KFTC Imposes Sanctions Against Qualcomm's Abuse of SEPs of Mobile Communications, KFTC (Dec. 28, 2016), http://www.ftc.go.kr/eng/solution/solution.jsp?file_name1=/files/bbs/2017/&file_name2=KFTC%20imposes%20sanctions%20against%20Qualcomm%A1%AFs%20abuse%20of%20SEPs%20of%20mobile%20communications.pdf (last visited January 25, 2017)

[12] Press Release, Antitrust: Commission Sends Two Statements of Objections on Exclusivity Payments and Predatory Pricing to Qualcomm, European Commission

97.    Investigations and/or hearings of Qualcomm are ongoing before the JFTC and the Taiwan Fair Trade Commission (TFTC).

**E.    Qualcomm's Anticompetitive Conduct Has Directly Harmed Consumers**

98.    Qualcomm's anticompetitive conduct, including the abuse of its monopoly power to force device manufacturers and other licensees to pay unreasonably high royalties, has directly harmed Plaintiffs and Class Members in that they have been compelled to pay higher and supracompetitive prices for their cellular phones and other devices than they would have absent Qualcomm's unlawful conduct.

99.    Consumers purchased cellular devices either from direct purchaser device manufacturers such as Samsung, or through their network carrier, such as Verizon and Sprint. Because device manufacturers and network carriers are subject to price competition, they do not absorb Qualcomm's unlawful royalties, which are a percentage of the wholesale costs of the device.  Instead, the excess royalty is passed along to consumers.

100.    Qualcomm's patent rights are closely intertwined with the cellular devices themselves. The effect of the anticompetitive conduct alleged in this Complaint is targeted at the cellular device as a whole, not its components separately, as reflected in Qualcomm's royalties that are based on the price of the cellular device as a whole.

101.    If Qualcomm were to charge a fair and reasonable royalty and comply with its FRAND obligations, consumers, including Plaintiffs and Class Members, would benefit from lower prices for cellular phones and other devices.

(Dec. 8, 2015), http://europa.eu/rapid/press-release_IP-15-6271_en.htm (last visited January 25, 2017)

CLASS ACTION COMPLAINT

# VI.    MARKET DEFINITION

102.    The relevant geographic market for purposes of this action is the United States and its territories.

103.    The relevant product markets are: (1) the market for CDMA and premium LTE modem chipsets ("Modem Chipset Market"), also known as baseband processors, which allow cellular devices to communicate with carrier networks and (2) intellectual property rights associated with SEPs ("SEP Licensing Market"). These two products will be referred to collectively as the "Cellular Device Components."

104.    Qualcomm directly participates in the market for the sale of cellular devices to Plaintiffs and Class Members by encumbering cellular devices through its licenses (and related excessive royalties). Specifically, Qualcomm's royalty payments are calculated as a percentage of the wholesale price of the cellular devices, which in turn increases the retail price of those devices.

105.    Plaintiffs purchase the Cellular Device Components when they buy a cellular device.  Plaintiffs' injuries are inextricably intertwined with Qualcomm's anticompetitive conduct with respect to chipset modems and abuse of patent rights because it has increased the cost to them of buying cellular devices by, among other things, (a) eliminating competition, allowing Qualcomm to charge supracompetitive prices for its chipsets and licenses, and (b) forcing device manufacturers to agree to unfair licensing terms, including excessive royalties.

# VII.    CLASS ACTION ALLEGATIONS

106.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure. Plaintiffs seek equitable, injunctive relief and monetary relief under the Sherman Act 15 U.S.C. Section 2 and/or California law on behalf of the following class (the "Nationwide Class"):

CLASS ACTION COMPLAINT

> All persons and entities in the United States who purchased or paid for some or all of the purchase price for CDMA- and/or premium LTE cellular devices ("Relevant Cellular Devices") from January 25, 2013 through the present.   This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for those who have purchased Relevant Cellular Devices; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

107.   Concurrently with, and alternatively to, the claim for nationwide monetary relief under California law, Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages or monetary relief  pursuant to the common law of unjust enrichment and individual state antitrust and state consumer laws for each of the states listed below (the "Indirect Purchaser States")[13] on behalf of the following class (the "Damages Class"):

> All persons and entities in the United States who purchased or paid for some or all of the purchase price for CDMA-, and/or premium LTE cellular devices ("Relevant Cellular Devices") from January 25, 2013 through the present.   This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for those who have purchased Relevant Cellular Devices; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

---

[13] The "Indirect Purchaser States" consist of Arizona, Arkansas, California, Colorado, District of Columbia, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

CLASS ACTION COMPLAINT

108.   The Nationwide Class and the Damages Class are referred to herein as the "Classes."

109.   While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are millions of members in each Class.

110.   Common questions of law and fact exist as to all Class Members. Qualcomm's anticompetitive conduct in maintaining monopoly power, as set forth in this Complaint, is generally applicable to all members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such common questions of law and fact include, without limitation, the following:

a.   Whether Qualcomm possessed, acquired, and/or maintained monopoly power over the Cellular Device Components in the United States during the Class Period;

b.   Whether Qualcomm possessed, acquired, and/or maintained monopoly power in the Modem Chipset Market in the United States during the Class Period;

c.   Whether Qualcomm possessed, acquired, and/or maintained monopoly power in the SEP Licensing Market in the United States during the Class Period;

d.   Whether Qualcomm tied the sale of its CDMA- and premium LTE- based chipsets to the purchase of license rights to its patent portfolio (including SEPs and non-SEPs);

e.   Whether Qualcomm's acquisition and maintenance of its monopoly power in the above markets violated the Sherman Act, as alleged in Count I;

f.   Whether Qualcomm's conduct violated California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, as alleged in Count II;

g.   Whether Qualcomm's conduct as set forth in this Complaint violated state antitrust and/or state consumer protection laws, as alleged in Counts III and IV;

h.   Whether the Qualcomm unjustly enriched itself to the detriment of the Plaintiffs and Class Members, thereby entitling Plaintiffs and Class Members to disgorgement of all benefits derived by Qualcomm, as alleged in Count V;

i.   Whether Qualcomm's unlawful conduct, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

j.   The effect of Qualcomm's unlawful conduct on the prices of

23

Relevant Cellular Devices sold in the United States and its territories during the Class Period;

k.    The appropriate injunctive and related equitable relief for the Nationwide Class; and

l.    The appropriate measure of Classwide damages for the Damages Class.

111.    Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Qualcomm's unlawful conduct as set forth in this Complaint, in that they paid artificially inflated prices for their cellular phones and other devices purchased indirectly from Qualcomm.  Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

112.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are aligned and coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

113.    The questions of law and fact common to members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

114.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

115.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

## COUNT I

### Monopolization in Violation of Section 2 of the Sherman Act

116.   Plaintiffs repeat the allegations set forth above as if fully set forth here.

117.   Qualcomm's conduct, as alleged this Complaint, constitutes unlawful monopolization of the market for Cellular Device Components, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

118.   General antitrust principles apply to conduct involving intellectual property just as they do to conduct involving other forms of property.

119.   Monopoly power is the ability to control prices and exclude competition in a given market. Because Qualcomm can profitably raise prices without causing competing firms to expand output and drive down prices, and its anticompetitive conduct has excluded competition, Qualcomm has monopoly power.

120.   Qualcomm has monopoly power in the Modem Chipset Market. Qualcomm controls the CDMA chipset supply, historically controlling over 90% of the CDMA modem chipset market and at the lowest point still controlling 83% of this market.  Qualcomm also controls the Modem Chipset Market, controlling at relevant times up to 90% of the market, and today over 60% of the market. Qualcomm still exclusively supplies multimode CDMA-LTE chipsets that are backward compatible with CDMA.

121.   Substantial barriers to entry, including those identified above, exist. CDMA- and premium LTE- based technology is not substitutable for other technologies. Qualcomm controls the patents or SEPs underlying CDMA technology, and Qualcomm has maintained this monopoly by, among other things,

1    refusing to license to competitors and requiring purchasers of its chipsets to agree

2    to its licenses for its patent portfolio.

3        122.  Qualcomm's monopoly power is demonstrated by Qualcomm's

4    ability to repeatedly force device manufacturers to accept unreasonable license

5    agreements and related terms, including excessively high royalties terms.

6        123.  Qualcomm also has monopoly power over the SEP Licensing Market.

7    SSOs have selected standards based on technology for which Qualcomm owns

8    multiple patents, based on the condition that Qualcomm would fulfill its FRAND

9    obligations.  Qualcomm holds and has held throughout the relevant period

10   virtually all of the SEPS for CDMA standard-based technologies, which underlie

11   nearly all 3G devices and 4G-LTE devices which are 3G-compatible. As these

12   patents are "essential" to the CDMA standard, other patents and patented

13   technology cannot replace or serve as an alternative for Qualcomm's patents.

14   Qualcomm's market power is further demonstrated by Qualcomm's ability force

15   OEMs to agree to unfair and unreasonable license agreements and terms, including

16   excessive royalties. Because OEMs need to use Qualcomm's technology for their

17   devices to communicate with the major carrier networks, they have no choice but

18   to agree to Qualcomm's unfair and unreasonable licensing terms.

19       124.  As previously alleged, Qualcomm has acquired and maintained its

20   monopoly power in the Cellular Device Components described above through

21   anticompetitive, exclusionary acts, including, among other things, excluding

22   competitors and forcing OEMs to agree to non-FRAND terms.

23       125.  Qualcomm holds monopoly power over the Cellular Device

24   Components because it can encumber Relevant Cellular Devices with a royalty it

25   imposes without other firms competing to drive down these prices. Specifically,

26   Qualcomm's control over the Cellular Device Components has allowed it to force

27   license agreements on its competitors and OEMs, and its license agreements allow

28   Qualcomm to charge a licensing fee unfairly based on the wholesale price of the

entire completed device. In other words, each Relevant Cellular Device sold with or based on Qualcomm technology is also encumbered by Qualcomm's excessive royalties, which in turn increase the cost of the device for consumers, including Plaintiffs and Class Members.

126.   There is no procompetitive justification for Qualcomm's anticompetitive conduct. Qualcomm induced SSOs to use its technology and related patents in setting their standards on the promise that it would adhere to FRAND obligations.  But Qualcomm has not met its FRAND obligations, and instead, has abused its monopoly power in the Cellular Device Components to force OEMs into licenses with unfair and unreasonable terms, including, but not limited to, its excessively high royalty rates based on the selling price of the completed device rather than the value of Qualcomm's contribution to that device.

127.   Qualcomm's acts have likely harmed the development of cellular technologies, as it forced out competitors, thus reducing innovation and competitive pricing.

128.   Plaintiffs and members of the Classes were harmed as a direct result of Qualcomm's unlawful conduct as set forth in this Complaint. Qualcomm's anticompetitive conduct increased the purchase price of Plaintiffs' relevant cellular devices. Qualcomm's unlawful conduct harmed innovation and competition, which harmed Plaintiffs and members of the Classes in the quality and price of their relevant cellular devices.

## COUNT II

### Nationwide Claim For Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*

129.   Plaintiffs repeat the allegations set forth above as if fully set forth here.

130.   During the Class Period, Qualcomm engaged in the monopolistic and anticompetitive conduct set forth in this Complaint in unreasonable restraint of

trade and commerce and in violation of California Business and Professions Code sections 16700, *et seq*. Section 16700 encompasses and prohibits agreements between a monopolist and its customers under which the monopolist effectively coerces the customer to accede to the restraint in order to obtain the good or service that is the subject of the agreement. Here, despite and in violation of its FRAND obligations, Qualcomm unilaterally imposed royalty rates that were unreasonable and far above what it could have obtained in a true FRAND negotiation.

131.    Qualcomm's conduct constitutes a "combination" under the Cartwright Act. As alleged in this Complaint, Qualcomm established an unlawful scheme by which it acquired and maintained monopoly power in the Modem Chipset Market and the SEP Licensing Market through the anticompetitive practices set forth in this Complaint, including by excluding competition.

132.    The Relevant Cellular Devices are commodities.

133.    As a direct result of Qualcomm's unlawful conduct, Plaintiffs and the Class were overcharged when they purchased their Relevant Cellular Devices.

134.    Application of California antitrust law to the Nationwide Class is appropriate. Qualcomm is headquartered in California. Qualcomm subjected its competitors as well as OEMs that reside and do business in California to its unlawful conduct, resulting in Qualcomm securing a significant portion of its profits as a result of its unlawful scheme from companies doing business in California. California has a large population and it was therefore foreseeable that a substantial number of California consumers would be impacted by Qualcomm's unlawful conduct as set forth in this Complaint.

# COUNT III

## Nationwide Claim For Violations of the California
## Unfair Competition Law,
## Cal. Bus. & Prof. Code §§ 17200, *et seq*.

135.   Plaintiffs repeat the allegations set forth above as if fully set forth here.

136.   Qualcomm's conduct as alleged in this Complaint constitutes a violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibits, *inter alia*, unlawful and unfair business practices.

137.   Plaintiffs bring this claim on behalf of themselves, the Damages Class, and the public as private attorneys general pursuant to Cal. Bus. & Prof. Code § 17204.

138.   As set forth above, Qualcomm's conduct constitutes violations of the Sherman Act and the Cartwright Act. Therefore, Qualcomm's acts constitute unlawful conduct under § 17200. Qualcomm unlawfully acquired and maintained its monopoly over the Modem Chipset Market and the SEP Licensing Market by engaging in the anticompetitive conduct set forth in this Complaint, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to keep out competitors, and forcing OEMs to license its patent portfolio.

139.   Qualcomm's conduct was unlawful and unfair in that it induces SSOs to use its technology on Qualcomm's promise that it would comply with FRAND obligations. After SSOs selected Qualcomm's technology for their standards, Qualcomm refused to comply with its FRAND promises and obligations.

140.   Qualcomm's conduct is further unfair to Plaintiffs and members of the Class because, as a direct result of Qualcomm's acts described in this Complaint, Plaintiffs and members of the Class were charged more for their

Relevant Cellular Devices than they would have been but for Qualcomm's conduct.

141.   Plaintiffs and the Class seek and are entitled to all forms of relief available under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17203, including restitution and disgorgement of all earnings, profits, compensation, benefits and other ill-gotten gains obtained by Qualcomm as a result of its conduct in violation of Business & Professions Code § 17200 *et seq.*

142.   Application of California antitrust law to the Nationwide Class is appropriate.  Qualcomm is headquartered in California, and Qualcomm subjected its competitors as well as handset companies that reside in California to its unlawful conduct. In doing so, Qualcomm obtained a significant portion of its profits as a result of its unlawful scheme from companies doing business in California. Additionally, California is the most populous state in the country, and it was foreseeable that substantial numbers of California consumers would be impacted by Qualcomm's unlawful behavior.

143.   Pursuant to Business & Professions Code § 17204, Plaintiffs and the Damages Class seek an order of this Court enjoining Qualcomm from continuing to engage in the acts set forth in this Complaint, which acts constitute violations of Business & Professions Code § 17200, *et seq*. Plaintiffs, the Class and the public will be irreparably harmed if such an order is not granted, as Qualcomm's conduct is ongoing.

## COUNT IV

### Violations of Other State Antitrust Laws

144.   Plaintiffs repeat the allegations set forth above as if fully set forth here.

145.   By engaging in the conduct set forth in this Complaint – including, without limitation, Qualcomm's (a) failure to license standard-essential patents to all applicants on FRAND terms, (b) withholding Qualcomm's baseband

processors unless a customer accepts a license to SEPs on terms imposed by Qualcomm, including excessive and unlawful royalties that the customer must pay when using competitors' processors ("no license – no chips"), (c) refusing to license its cellular standard-essential patents to competitors, in violation of Qualcomm's FRAND commitments, and (d) entering into exclusive dealing arrangements, including with Apple Inc. – Qualcomm committed knowing, willful and flagrant violations of the following state anticompetitive and consumer protection statutes.

146.    Arizona: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Arizona Revised Statutes §§ 44-1401, *et seq*. During the Class Period, Qualcomm's illegal conduct substantially affected Arizona commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

147.    California: During the Class Period, Qualcomm engaged in monopolistic and anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of California Business and Professions Code sections 16700, *et seq*. Section 16700 encompasses agreements between a monopolist and its customers where the monopolist effectively coerces the customer to accede to the restraint in order to obtain the good or service that is the subject of the agreement. That is what happened here. Despite its FRAND obligations, Qualcomm unilaterally imposed royalty rates that were unreasonable and exceeded what it could have obtained in a true FRAND negotiation. This conduct constitutes a "combination" under the Cartwright Act.

148.   Qualcomm established an unlawful scheme by which it acquired and maintained monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive means, including by excluding competition.

149.   The Relevant Cellular Devices are commodities.

150.   As a direct result of Qualcomm's unlawful conduct, Plaintiffs and the Class were overcharged when they purchased their Relevant Cellular Devices.

151.   <u>Colorado</u>: During the Class Period, Qualcomm engaged in monopolistic and anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of Colorado Antitrust Law, Rev. Stat. Ann. § 6-2-103 (1)[14].  Despite its FRAND obligations, Qualcomm unilaterally imposed royalty rates that were unreasonable and exceeded what it could have obtained in a true FRAND negotiation. Moreover it required a customer to accepts a license to SEPs on terms imposed by Qualcomm that the customer did not want, including excessive and unlawful royalties that the customer was required to pay when using competitors' processors, before Qualcomm would sell that customer its baseband processors. Qualcomm established an unlawful scheme by which it acquired and maintained monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive means, including by excluding competition.

152.   The Relevant Cellular Devices are commodities.

153.   As a direct result of Qualcomm's unlawful conduct, Plaintiffs and the Class were overcharged when they purchased their Relevant Cellular Devices.

154.   <u>District of Columbia</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of District of Columbia Code Annotated §§ 28-4501, *et seq.* During the Class Period, Qualcomm's illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

---

[14] Plaintiffs will amend to include violation of Colorado Rev. Stat. Ann. § 6-2-103(4) if Qualcomm does not cure the violation within the statutory time period after written notification of its violation.

Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

155.   <u>Illinois</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*). During the Class Period, Qualcomm's illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*). Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*).

156.   <u>Iowa</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Iowa Code §§ 553.1, *et seq.* During the Class Period, Qualcomm's illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553, *et seq.*

157.   <u>Kansas</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Kansas Statutes Annotated, §§ 50-101, *et seq.* During the Class Period, Qualcomm's illegal conduct substantially affected

1 Kansas commerce. As a direct and proximate result of Qualcomm's unlawful
2 conduct, Plaintiffs and members of the Damages Class have been injured in their
3 business and property and are threatened with further injury. By reason of the
4 foregoing, Qualcomm has monopolized in restraint of trade in violation of Kansas
5 Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages
6 Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

7 158. <u>Maine</u>: Qualcomm's monopolization and anticompetitive conduct has
8 restrained trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10,
9 §§ 1101, *et seq.*). During the Class Period, Qualcomm's illegal conduct
10 substantially affected Maine commerce. As a direct and proximate result of
11 Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class
12 have been injured in their business and property and are threatened with further
13 injury. By reason of the foregoing, Qualcomm has monopolized in restraint of
14 trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly,
15 Plaintiffs and members of the Damages Class seek all relief available under Maine
16 Rev. Stat. Ann. 10, §§ 1101, *et seq.*

17 159. <u>Michigan</u>: Qualcomm's monopolization and anticompetitive conduct
18 has restrained trade in violation of Michigan Compiled Laws Annotated §§
19 445.771, *et seq.* During the Class Period, Qualcomm's illegal conduct
20 substantially affected Michigan commerce. As a direct and proximate result of
21 Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class
22 have been injured in their business and property and are threatened with further
23 injury. By reason of the foregoing, Qualcomm has monopolized in restraint of
24 trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly,
25 Plaintiffs and members of the Damages Class seek all relief available under
26 Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

27 160. <u>Minnesota</u>: Qualcomm's monopolization and anticompetitive conduct
28 has restrained trade in violation of Minnesota Annotated Statutes §§ 325D.49, *et*

1  *seq.* During the Class Period, Qualcomm's illegal conduct substantially affected

2  Minnesota commerce. As a direct and proximate result of Qualcomm's unlawful

3  conduct, Plaintiffs and members of the Damages Class have been injured in their

4  business and property and are threatened with further injury. By reason of the

5  foregoing, Qualcomm has monopolized in restraint of trade in violation of

6  Minnesota Stat. §§ 325D.49, *et seq.* Accordingly, Plaintiffs and members of the

7  Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

8      161.   <u>Mississippi</u>: Qualcomm's monopolization and anticompetitive

9  conduct has restrained trade in violation of Mississippi Code Annotated §§ 75-21-

10 1, *et seq.* During the Class Period, Qualcomm's illegal conduct substantially

11 affected Mississippi commerce. As a direct and proximate result of Qualcomm's

12 unlawful conduct, Plaintiffs and members of the Damages Class have been injured

13 in their business and property and are threatened with further injury. By reason of

14 the foregoing, Qualcomm has monopolized in restraint of trade in violation of

15 Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs and members of

16 the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-

17 1, *et seq.*

18     162.   <u>Nebraska</u>: Qualcomm's monopolization and anticompetitive conduct

19 has restrained trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*

20 During the Class Period, Qualcomm's illegal conduct substantially affected

21 Nebraska commerce. As a direct and proximate result of Qualcomm's unlawful

22 conduct, Plaintiffs and members of the Damages Class have been injured in their

23 business and property and are threatened with further injury. By reason of the

24 foregoing, Qualcomm has monopolized in restraint of trade in violation of

25 Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Plaintiffs and members

26 of the Damages Class seek all relief available under Nebraska Revised Statutes §§

27 59-801, *et seq.*

28

163.   <u>Nevada</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Nevada Revised Statutes Annotated §§ 598A.010, *et seq*. During the Class Period, Qualcomm's illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

164.   <u>New Hampshire</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. During the Class Period, Qualcomm's illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

165.   <u>New Mexico</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq*. During the Class Period, Qualcomm's illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiffs and members of

the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

166.    New York: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of New York General Business Laws §§ 340, *et seq.* During the Class Period, Qualcomm's illegal conduct substantially affected New York commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

167.    North Carolina: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.* During the Class Period, Qualcomm's illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq.*

168.    North Dakota: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of North Dakota Century Code §§ 51-08.1-01, *et seq.* During the Class Period, Qualcomm's illegal conduct substantially affected North Dakota commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of

1   the foregoing, Qualcomm has monopolized in restraint of trade in violation of

2   North Dakota Cent. Code §§ 51-08.1-01, *et seq*. Accordingly, Plaintiffs and

3   members of the Damages Class seek all relief available under North Dakota Cent.

4   Code §§ 51-08.1-01, *et seq*.

5       169.   <u>Oregon</u>: Qualcomm's monopolization and anticompetitive conduct

6   has restrained trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*.

7   During the Class Period, Qualcomm's illegal conduct substantially affected

8   Oregon commerce. As a direct and proximate result of Qualcomm's unlawful

9   conduct, Plaintiffs and members of the Damages Class have been injured in their

10  business and property and are threatened with further injury. By reason of the

11  foregoing, Qualcomm has monopolized in restraint of trade in violation of Oregon

12  Revised Statutes §§ 646.705, *et seq*. Accordingly, Plaintiffs and members of the

13  Damages Class seek all relief available under Oregon Revised Statutes §§

14  646.705, *et seq*.

15      170.   <u>South Dakota</u>: Qualcomm's monopolization and anticompetitive

16  conduct has restrained trade in violation of South Dakota Codified Laws §§ 37-1-

17  3.1, *et seq*. During the Class Period, Qualcomm's illegal conduct substantially

18  affected South Dakota commerce. As a direct and proximate result of Qualcomm's

19  unlawful conduct, Plaintiffs and members of the Damages Class have been injured

20  in their business and property and are threatened with further injury. By reason of

21  the foregoing, Qualcomm has monopolized in restraint of trade in violation of

22  South Dakota Codified Laws Ann. §§ 37-1, *et seq*. Accordingly, Plaintiffs and

23  members of the Damages Class seek all relief available under South Dakota

24  Codified Laws Ann. §§ 37-1, *et seq*.

25      171.   <u>Tennessee</u>: Qualcomm's monopolization and anticompetitive conduct

26  has restrained trade in violation of Tennessee Code Annotated §§ 47-25-101, *et*

27  *seq*. During the Class Period, Qualcomm's illegal conduct substantially affected

28  Tennessee commerce. As a direct and proximate result of Qualcomm's unlawful

conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

172.  <u>Utah</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*. During the Class Period, Qualcomm's illegal conduct substantially affected Utah commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq*.

173.  <u>Vermont</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*. During the Class Period, Qualcomm's illegal conduct substantially affected Vermont commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

174.  <u>West Virginia</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of West Virginia Code §§ 47-18-1, *et seq*. During the Class Period, Qualcomm's illegal conduct substantially affected West

Virginia commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

175.    <u>Wisconsin</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Wisconsin Statutes §§ 133.01*, et seq*. During the Class Period, Qualcomm's illegal conduct substantially affected Wisconsin commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

176.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendant's unlawful monopolization. Plaintiffs and members of the Damages Class have paid more for Relevant Cellular Devices than they otherwise would have paid in the absence of Defendant's unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendant's conduct unlawful.

177.    In addition, Defendant has profited significantly from the aforesaid monopolization. Defendant's profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

178.   Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## COUNT V

### Violation of Other State Consumer Laws

179.   Plaintiffs repeat the allegations set forth above as if fully set forth here.

180.   By engaging in the unlawful conduct set forth in this Complaint – including, without limitation, Qualcomm's (a) failure to license standard-essential patents to all applicants on FRAND terms, (b) withholding Qualcomm's baseband processors unless a customer accepts a license to SEPs on terms imposed by Qualcomm, including excessive and unlawful royalties that the customer must pay when using competitors' processors ("no license – no chips"), (c) refusing to license its cellular standard-essential patents to competitors, in violation of Qualcomm's FRAND commitments, and (d) entering into exclusive dealing arrangements, including with Apple Inc. – Qualcomm engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer laws listed below.

181.   California: Defendant has engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, et seq. During the Class Period, Defendant manufactured, marketed, sold, or distributed Relevant Cellular Devices in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, et seq. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and

Professions Code, to obtain restitution from this Defendant for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. The Defendant's conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendant, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unlawful and unfair business acts or practices within the meaning of California Business and Professions Code §17200, et seq., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq*. of the California Business and Professions Code, set forth above. Defendant's acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq*. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair and unfair; and (3) Defendant's acts or practices are unfair to purchasers of Relevant Cellular Devices in the State of California within the meaning of Section 17200, California Business and Professions Code. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendant as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendant will not continue such activity into the future. The unlawful and unfair business practices of Defendant as described above have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for Relevant Cellular Devices. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendant as alleged in this Complaint violates Section 17200 of the California Business and Professions Code. As alleged in this

Complaint, Defendant has been unjustly enriched as a result of its wrongful conduct and by Defendant's unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendant as a result of such business practices, pursuant to the California Business and Professions Code, §§ 17203 and 17204.

182.   Colorado: Defendant has engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of Colorado Consumer Protection Act, Rev. Stat. Ann. §§ 6-1-105(1)(a-c), (h) and (u) ("Colorado CPA"). During the Class Period, Defendant manufactured, marketed, sold, or distributed Relevant Cellular Devices in California, and committed and continue to commit acts of unfair competition, as defined by the Colorado CPA, by engaging in the acts and practices specified above. This claim is instituted pursuant to the Colorado CPA to obtain restitution from this Defendant for acts, as alleged herein, that violated the Colorado CPA. The Defendant's conduct as alleged herein violated the Colorado CPA. The acts, omissions, misrepresentations, practices and non-disclosures of Defendant, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unlawful and unfair business acts or practices within the meaning of the Colorado CPA., including, but not limited to, the following: (1) (1)knowingly passing off goods, services, or property as those of another; (b) knowingly making a false representation as to the source, sponsorship, approval, or certification of goods, services, or property; (c) knowingly making a false representation as to affiliation, connection, or association with or certification by another.  Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendant as a result of such business acts or practices. The illegal conduct alleged herein is continuing and

1   there is no indication that Defendant will not continue such activity into the future.

2   The unlawful and unfair business practices of Defendant as described above have

3   caused and continue to cause Plaintiffs and members of the Damages Class to pay

4   supracompetitive and artificially-inflated prices for Relevant Cellular Devices.

5   Plaintiffs and members of the Damages Class suffered injury in fact and lost

6   money or property as a result of such unfair competition. The conduct of

7   Defendant as alleged in this Complaint violates the Colorado CPA. As alleged in

8   this Complaint, Defendant has been unjustly enriched as a result of its wrongful

9   conduct and by Defendant's unfair competition. Plaintiffs and members of the

10  Damages Class are accordingly entitled to equitable relief including restitution

11  and/or disgorgement of all revenues, earnings, profits, compensation, and benefits

12  that may have been obtained by Defendant as a result of such business practices,

13  pursuant to the Colorado CPA.

14      183.   District of Columbia: Defendant has engaged in unfair competition or

15  unfair, unconscionable, or deceptive acts or practices in violation of District of

16  Columbia Code § 28-3901, *et seq*. Defendant agreed to, and did in fact, act in

17  restraint of trade or commerce by affecting, fixing, controlling and/or maintaining,

18  at artificial and/or non-competitive levels, the prices at which Relevant Cellular

19  Devices were sold, distributed or obtained in the District of Columbia. The

20  foregoing conduct constitutes "unlawful trade practices," within the meaning of

21  D.C. Code § 28-3904. Plaintiffs and members of the Damages Class were not

22  aware of Defendant's illegal conduct and were therefore unaware that they were

23  being unfairly and illegally overcharged. There was a gross disparity of bargaining

24  power between the parties with respect to the price charged by Defendant for

25  Relevant Cellular Devices. Defendant had the sole power to set that price and

26  Plaintiffs and members of the Damages Class had no power to negotiate a lower

27  price. Moreover, Plaintiffs and members of the Damages Class lacked any

28  meaningful choice in purchasing Relevant Cellular Devices because they were

44

unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendant's conduct with regard to sales of Relevant Cellular Devices, including its illegal conduct with respect to fixing the price of Relevant Cellular Devices at supracompetitive levels and overcharging consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendant at the expense of Plaintiffs and the public. Defendant took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendant's conduct has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for the Relevant Cellular Devices. Defendant's unlawful conduct had the following effects: (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular Devices. As a direct and proximate result of the Defendant's conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

184.    Florida: Defendant has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*. Defendant's unlawful conduct had the following effects: (1) Relevant Cellular Devices price

competition was restrained, suppressed, and eliminated throughout Florida; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular Devices. During the Class Period, Defendant's illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

185.    <u>South Carolina</u>: Defendant has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-5-10, et seq.) Defendant's monopolization had the following effects: (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for the Relevant Cellular Devices during the Class Period. Defendant's illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in

violation of S.C. Code Ann. §§ 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

## COUNT VI

### Unjust Enrichment

186.    Plaintiffs repeats the allegations set forth above as if fully set forth here.

187.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

188.    As a result of its unlawful conduct set forth in this Complaint, Qualcomm has benefited and will continue to benefit from the overcharges on sales of Relevant Cellular Devices. Qualcomm has been unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits related to the Relevant Cellular Devices.

189.    Qualcomm's financial benefits are traceable to Plaintiffs' and Members of the Damages Class's overpayments incurred in purchasing Relevant Cellular Devices.

190.    Plaintiffs and Class Members have conferred and continue to confer an economic benefit upon Qualcomm in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and Damages Class Members.

191.    Qualcomm has benefited from its unlawful acts and it would be inequitable for it to be permitted to retain any of the ill-gotten gains resulting from its unlawful practices and the overpayments made by Plaintiffs members of the Damages Class for Relevant Cellular Devices during the Class Period.

192.    It would be futile for Plaintiffs and Class Members to seek a remedy from any party with whom they have or had privity of contract. Qualcomm has

1    paid no consideration to anyone for any of the benefits it received indirectly from

2    Plaintiffs and Class Members.

3         193.   It would be futile for Plaintiffs and Class Members to seek to exhaust

4    any remedy against the immediate intermediary in the chain of distribution from

5    which they purchased Relevant Cellular Devices during the Class Period.

6         194.   The economic benefit Qualcomm derives from charging

7    anticompetitive, artificially inflated prices for Relevant Cellular Devices is a direct

8    and proximate result of Qualcomm's unlawful practices set forth in this

9    Complaint.

10        195.   The financial benefits Qualcomm derived rightfully belong to

11   Plaintiffs and Class Members, who paid, and continue to pay, anticompetitive

12   prices that inured to Qualcomm's benefit.

13        196.   It would be inequitable under unjust enrichment principles under the

14   laws of each of the states of the United States (except for Ohio and Indiana), and

15   under the laws of the District of Columbia for Qualcomm to retain any of the

16   overcharges Plaintiffs and Damages Class Members paid for Relevant Cellular

17   Devices that were derived from Qualcomm's unfair and unconscionable methods,

18   acts and trade practices set forth in this Complaint.

19        197.   Qualcomm is aware of and appreciates the benefits bestowed upon it

20   by Plaintiffs and the Class.

21        198.   Qualcomm should be compelled to disgorge all unlawful or

22   inequitable proceeds it received in a common fund for the benefit of Plaintiffs and

23   Class Members.

24        199.   Plaintiffs and members of the Damages Class are entitled to the

25   establishment of a constructive trust consisting of all ill-gotten gains Qualcomm

26   received that are traceable to Plaintiffs and Class Members from which Plaintiffs

27   and members of the Damages Class may make claims on a pro rata basis.

28        200.   Plaintiffs and Class Members have no adequate remedy at law.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment that:

1.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

2.    The unlawful conduct alleged in this Complaint constituted a violation of Section 2 of the Sherman Act, and the state antitrust and consumer laws set forth above;

3.    Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state antitrust and consumer laws, and that a joint and several judgment in favor of Plaintiffs and members of the Damages Class be entered against Qualcomm in an amount to be trebled to the extent such laws permit;

4.    Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

5.    Defendant, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct alleged herein, or from committing any other conduct having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.    Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendant obtained as a result of their acts of unfair competition and acts of unjust enrichment;

7.      Plaintiffs and members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.


Dated: February 23, 2017          Respectfully submitted,

By:   _s/Jason S. Hartley_
          Jason S. Hartley (SBN 192514)
          Jason M. Lindner (SBN 211451)
          STUEVE SIEGEL HANSON, LLP
          550 West C Street, Suite 1750
          San Diego, CA 92101
          Telephone: (619) 400-5822
          Facsimile: (619) 400-5832
          Email: hartley@stuevesiegel.com
                    lindner@stuevesiegel.com

          Garrett D. Blanchfield
          Brant D. Penney
          REINHARDT WENDORF &
          BLANCHFIELD
          E1250 First National Bank Bldg.
          332 Minnesota Street
          St. Paul, MN  55101
          Telephone: (651) 287-2100
          Facsimile:  (651) 287-2103
          Email:  g.blanchfield@rwblawfirm.com
                    b.penney@rwblawfirm.com

          *Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT